We've got Mr. Norris here for the appellant, Mr. Billis here for the appellee, and Mr. Norris, whenever you're ready. Mr. Norris Thank you, Your Honors. May it please the Court. The question in this case is not about whether universities can regulate harassment or facilitate conversations about bias. They clearly can. The question in this case is about whether the two policies the university uses, the discriminatory harassment policy and the bias-related incidents policy, go too far and thus chill students' protected speech. Can I ask you a question, and I'm just going to confess, I need some help here. You mentioned chill, and I don't think I fully understand, like, how and where chill applies here, right? Is chill a standing issue, that it sort of, like, duplicates or serves this credible threat of enforcement issue, or is it a merits issue, or is it both? How does chill sort of affect the whole analysis here? We've got a big standing question and a big merits question. Some courts that have addressed these cases seem to talk in chill terms and some don't, and I'm just curious about how that sort of drives the analysis. Mr. Billis Right, so chill is the injury. It goes to standing. If a policy arguably covers the speech that you want to engage in, then that And then the merits question is whether looking at the text of that policy, whether it violates the First Amendment. So this gets most muddy, I think, with the bias response team issue, but really the inquiries sort of merge, not because they're the same question, but because once you conclude that the bias response team apparatus chills speech, then you look to the policy, which is the definition of bias-related incidents, which is what the bias response team enforces, and that policy is obviously unconstitutional. The university doesn't even It is content-based. It is vague. It reaches almost any version of controversial speech. It's subjective. It has all of the defects you would normally find in an unconstitutional  Mr. McLaughlin And do the two policies necessarily travel together? Like you said, the harassment policy is what the bias response team enforces. Does it enforce any other policy? And the flip side, can the anti-harassment policy be enforced in some other way? I assume it can. I mean, I assume if you're a professor, you can just bypass the response team and refer somebody over for discipline or something. I don't know how exactly that process works. Right. So the discriminatory harassment policy is incorporated into the student code of conduct. So if you violate it, you go through the normal disciplinary process. You can be expelled, suspended, sanctioned. You might have to write a paper, apologize, whatever the sanctions the university can impose. The bias response team, it's really a separate mechanism. We concede it doesn't have disciplinary authority in the traditional sense. It's not part of the code of conduct. It chills speech in other ways. But importantly, on its home page, the bias response team talks about hostile environment harassment. It really conflates disciplinary provisions with its functions, which we think is part of the reason it creates the perception, the threat, the intimidation that chills student  for a minute and let you go or let my colleagues ask questions. So on standing, like, so now that I think I've got my head around the fact that chill is sort of fundamentally a standing issue, does it stand in for credible threat of enforcement? Or is objective chill the credible threat of enforcement? Or are the two sort of separate? Am I making any sense here? Because, like, you know, I read the Sixth Circuit's opinion that addresses a similar issue at the University of Michigan. And my recollection is they don't even cite Susan B. Anthony. Like, I walked into this case thinking, oh, well, Susan B. Anthony is the pre-enforcement challenge case. And then the Sixth Circuit doesn't even talk about it and just talks about chill. And so it leads me to wonder, like, are these two things the same thing? I think this court has done a good job explaining this. I think other courts have overcooked this a little bit. So chill is a present injury. Normally, when you talk about pre-enforcement cases like Susan B. Anthony, you're talking about the threat of future injury. But chill is unique in that it's here now. We are currently not speaking because of the policy. And so what courts have said is that it's still really the credible threat analysis or the, you know, the credible threat of enforcement analysis because why are you chilled if there's no credible threat? The policy will be applied to that kind of speech. But because it's a present injury, it's not about speculative future possibilities, courts really apply a lower version of the credible threat standard. The full court in First Amendment cases. And Judge Marcus's opinion in the Harrell case says really all you need is that the policy arguably covers the speech and that there is a minimal probability that if the policy was violated, the state would enforce it. And I think Judge Marcus's opinion in Harrell also says credible threat is applied most loosely in First Amendment cases because the injury is already here. Tell me about standing with regard to the Just Nights response team. You concede that they have no disciplinary authority. What it amounts to is an invitation for a chat, if I have it right. It's kind of an intervention of sorts. Tell me where there's actual injury. Sure. Judge Marcus, we fundamentally disagree that it's just an invitation to chat. And it's like, you know, just to state the law here, the question is whether it objectively chills speech. And all going all the way back to Bantam Books, the Supreme Court has said it does not matter that the apparatus doesn't have disciplinary authority, formal sanctions, and that the policy is not prohibiting conduct per se. But if it's designed to threaten, chill, intimidate, that counts. The Pornography Commission in Bantam Books didn't have any of that authority either. But what it was was designed to discourage the things that the state couldn't prohibit under the First Amendment. We think the same thing is going on here. So, you know, separate and apart from its actual authority, the whole team is designed to make it seem like if you say a bias-related incident that you're going to get in trouble. The university has a formal definition of bias-related incident, and it's detailed. It uses words like objective, reasonableness, things you would see in the disciplinary code. And then it uses a formal team that is made up of university administrators, not professors, not other students, not counselors, but administrators and even a police officer to enforce that policy. It calls itself a response team, and the thing it says it's responding to is injustice. If you look at the homepage of the JKRT, the button you click to report another student to the team says, report injustice. It's almost presumed that it's unjust what they're responding to. They also solicit anonymous reports from other students about speech. It is a monitoring and reporting scheme that's always overlooking students on campus. They compare bias incidents to discriminatory harassment, as I mentioned before, which is sanctionable. They compare them to hate crimes. They say they create an unsafe and unwelcome and negative environment on campus. They make it seem like these things are things that are not allowed. And that's in order to discourage the speech from happening, not to merely make people engage in conversations about the speech. And there are more details. I know that your position is, as you stated, and those are the shortcomings that you see of this team, but you acknowledge in your reply brief that there could be an entity whose goal it was to try to promote speech and to have an understanding and relationship. And you recount the things you've just recounted in terms of the things that are wrong with this, and you suggest some things that you could do to make it right. Are there, to me, and I don't want to take up too much of your time, but are there just the essential characteristics that, to you, are the presence of them represents the death knell for a program, or the absence of which represents the death knell of a program? And you've mentioned, I won't ask you to repeat the ones you've already said unless you think they're ones that are particularly heinous and should be identified as being fatal to being able to develop such a program. I can say I haven't thought about the precise combination of factors, but I'll highlight what I think is the most important to crossing the line from legal to illegal. I'm sorry, what was? I'll identify those factors. Oh, yeah, yeah. The factors are they have a formal definition that looks like a disciplinary rule. They have a formal team that is staffed by people who, when they take off their JKRT hat, have disciplinary authority at the university. They ask students to come meet with them once they are accused of committing a bias incident. They have a formal reporting system that allows anonymous reports of bias by other students, and they warn throughout their policies that we have the power to refer bias incidents over to the actual disciplinary authorities. I think those are the key factors. If you take some of those, all of those, a combination of those out of the case, we probably wouldn't be here. Certainly, they have the power to talk to students and educate students, but they don't have the power to threaten and intimidate. Go ahead. Go ahead. No, no, you go ahead. Well, so I guess one thing about this case that I just find like a little bit ironic is that on your side, the sort of the vibe is everybody needs to put on their big boy and big girl pants and like go to college and get exposed and grow up. But then, to some extent, on the JKRT point, the response is to your argument to some extent is, well, I mean, like it's not really voluntary because these are impressionable kids away from home for the first time. And so it's kind of like, I don't know, snowflakes all around. And so I just wonder like what's the response to like what if somebody turned to you and said, tell your people to put on their big boy and big girl pants. And when they get something that says it's voluntary, they'll blow it off. Right. And so it's an objective standard. It's an objective, reasonable student who wants to say the things that our student wants to say. How would they perceive what's going on? We think that standard is satisfied. And the difference is we do think people should put their big boy, big girl pants on when they're conversing with each other on campus about things they disagree about. But the state is a really big boy. And it matters when the university itself is picking winners or losers and is using its coercive authority as a state actor to change the debate. And I think it's useful to think about, you know, my friend's position is that we don't even have standing to challenge this regime. So instead of bias incidents, just change it to conservative incidents, conservative speech on campus. I think my friend would say that they can regulate that equally because we don't have standing to say otherwise. But I think people would see through that pretty clearly that if there is a conservative speech response team that asks students to tell on each other if they hear anything conservative or Republican on campus, and then they'll monitor it, collect it, investigate, ask to meet with the conservative kids, threaten to refer the conservative kids to the disciplinary authorities. I think everyone would see that for what it is, which is designed to chill that kind of speech. Now, the only difference is you swap conservative for bias. But biased speech is in the eye of the beholder. It is equally protected by the First Amendment. So that shouldn't change. I have just one final question on this standing issue regarding Just Knights response team. As I looked at the Fifth, Sixth, and Seventh Circuit cases that were dealing with standing questions in similar arena, the Seventh Circuit found no standing. And one of the things that it highlighted was a finding of fact by the district court that most students contacted by the response team do not respond at all or decline the offer of a meeting. The Seventh Circuit went off on that and argued that the fact that the majority of students actually decline a meeting supports the conclusion that the students do not feel compelled to meet at all. But they just blew it off. Do we have any facts in this record about this matter to the extent they intervene and sent letters? How many students came down and chatted and how many students declined the meeting? I'm just a factual question. No, Your Honor, and that's crucial. And if my friend says that that's the case, he's saying that to you from the podium. That is not in the record. University did not say that in any of the declarations. There's no evidence to that effect. Our position is that the opposite is true. Our students have submitted declarations that say they do feel chilled by this policy. And then the default rule under the Code of Conduct is that when a university officer contacts you, you have to respond. Otherwise, that is an independent violation of the Student Code of Conduct. And we just think it's natural for a student, given the power dynamics, when you're contacted by someone accused of a bias incident and they tell you there's been a case that's been opened, so please come talk to us about it, you're going to feel like you have to respond or something adverse is going to happen to you. Getting to the harassment policy itself, I would like your help in telling us how we come up with a standard to apply. Assume arguendo for the purpose of the question that the policy, the harassment policy is overbroad. It covers protected speech and maybe stuff that isn't protected as well. They say, and they built it into their policy itself, that we should look to Title VII to find guidance. And they say we should take from that, extract from that body of law, severe or pervasive as kind of a standard to employ. You say, no, no, they've got that wrong. You should look to Title IX law, what the Supreme Court has said about Title IX, which puts it in terms of severe and pervasive and objectively offensive. I think I have that right, do I not? You look to Title IX, they look to Title VII. My question is, why would I look to Title IX or Title VII at all when I'm talking about speech, political speech issues, where I'm not concerned about discrimination in the workplace on account of gender? Why does the metric of Title IX or Title VII help me at all in coming up with some kind of standard? Sure, Your Honor. Before I answer that question, I'm going to answer it. I just want to say, even if they're right about that, this policy is also viewpoint discriminatory, which is not a defense, even if you thought Title VII was an appropriate standard. It's a totally separate defect with this policy. No, no, no. I understand and appreciate the point. I'm going beyond that, and I'm asking you to help me understand how we build some law around this. What do we look to? Do we look to Tinker? Well, it's Tinker-like in a college setting, but Tinker still has some application. Do we look to Title VII? Do we look to Title IX? Or do we look somewhere else? Or is it enough to say it's overbroad, it's content-based, it's viewpoint-based, it goes too far, goodbye, come up with a new standard? Are we obliged to say anything more than that here? And if we are, what is it that we ought to be saying? Well, you're not obliged because the viewpoint discriminatory flaw independently dooms this policy. But I hope you do reach the other question, which is really important and really a point of controversy. Federal statutes do not tell you what the Constitution means. That's pretty obvious. Statutes raise constitutional questions. They don't answer them. But the reason we point to Title IX in the Davis case is that the court was careful in the school context to articulate a very high standard for what's actionable harassment under Title IX, not only because that was the right interpretation of Title IX, but because it avoided the First Amendment concerns that Justice Kennedy raised in his dissent and that were incorporated and referenced in the majority opinion. They said it has to be severe and pervasive in order to become conduct and not cover speech. Severe and pervasive. If it happens a lot, it happens over and over, the speech rises to the level where it actually denies someone a right to an equal education. If you change those standards and you change the and to an or, you start to reach one-off incidents. You start to reach minor microaggressions that occur over a long period of time. You start to regulate things that merely alter someone's education as the university's policy does. That gets speech involved and that's where the over-breath problem comes in. We think Davis, the Davis standard for harassment is something of a safe harbor for universities. The education department requires them to use it under Title IX. The court articulated it with the First Amendment in mind, but once you go over that, as this court implied in Walschlager when it cited a bunch of cases about university speech codes, once you go above that, you get into speech. And as soon as you get into speech, you start to put content based and viewpoint based restrictions on it. Okay, very well. You have the full rebuttal time remaining. We carried you over. Mr., is it Billis? Am I pronouncing that correctly? Eilis, you're up. Eilis, I'm so sorry. No problem. No one ever gets it right. May it please the court. The district court got it absolutely right here and the court should affirm what the district court did. With respect to the JKRT, the plaintiff's speech first does not have standing to challenge their practices. The key facts here are, as the district court found and can only be overturned for abuse of discretion, participation in that process is completely voluntary and they have no disciplinary authority. Those are the key facts. Now, my colleague here says that there's some things missing from the record. That is not the university's fault. That's the plaintiff's burden on a motion for preliminary injunction to come forward with the facts that they think should support their case. You cannot draw inferences based on what's lacking in the record and hold it against the university. Well, but in fairness, though, I mean, he does more than that, right? I mean, he says, even though this does say on its face that it's voluntary, there is sort of this coercive atmosphere that attaches to it by virtue of these kind of scare words, you know, like bias, incident, case, injustice, things like this that would make, you know, I mean, I was making jokes about snowflakes, but I mean, that might make any 17 to 20 year old student think sort of like, holy cow, I'm in deep trouble. The district court did not make a factual finding that there was any objectively reasonable fear of being brought in and punished if you're contacted by the JKRT. Instead, the district court looked at what I think is a key document, which is at the appendix volume 4, page 83, which is the email template that the JKRT uses to invite students in. And right in there, it says, this is voluntary participation. We're not an extension of the HR department or the Office of Student Rights and Responsibilities. We have no authority to dispense punitive measures. Your participation is voluntary. If I do not receive a reply within two weeks, I will assume you do not have an interest in speaking with me and will close out this JKRT case. I don't think it's, you cannot say it is reasonable to fear this and to feel like you're going to be punished if you don't respond. I don't see how, what else they could do to make it more clear that it's voluntary. Do you, in your theory, is punishment at the end of the line necessary to chill? Or is, you know, sort of the stigma of being, of having been subjected to this process and thereby sort of been labeled a bigot or whatever sufficient? I don't know what that is, by the way. Sorry about that. It's happened the last two days as well. We're just going to power through. I don't know. I mean, I think you could posit some situations where an invitation by a body that doesn't have punitive authority, like the Billboard case, could cross over into a threat. But the key thing in the Billboard case is that the court there made a factual finding that everything that the, and there's also the case involving, well, anyway, sorry. The case in the Billboard case, the court made a finding that there was an implied threat there, that they were saying, if you don't deal with these billboards that we don't like, your business in our borough, you know, will be taken away effectively. You don't have that implied threat here. The district court did not make a factual finding of any implied threat. Let me ask you this. Isn't there the risk, or at least the fear, reasonably, that if this group is coming in and intervening, that they may refer a complaint to the Office of Student Conduct or some other group? This is kind of an intermediate step. We're trying to avoid doing that. A student wants to speak and is frightened of speaking legitimately because he's fearful that this group, this JKRT group, will refer the complaint to an authority that has the power to discipline or will refer it to the police department, campus police, which has its own law enforcement authority. And one member of this group is, after all, a campus cop. No, Your Honor, I don't think that makes it into an objectively reasonable fear that they'll be punished. I think the district court dealt with this the correct way when he wrote, any university official who gets a report made to them of something has the authority and the duty to refer that to student conduct or to law enforcement if it rises to the level of a crime or student conduct violation. So just the fact that the JKRT has the ability to make referrals, I don't think is enough to show that a student who receives an invitation in for a voluntary process where no punishment can be dished out by the JKRT should fear coming in for that. I think, Judge Newsom, your point about Speech First wanting to encourage speech, wanting everybody to come in and learn, this is an educational opportunity that the school has created for these students to come in and speak with people of different views. It's exactly what Speech First should be championing. So I think you cannot... In fairness, though, I mean, wouldn't, couldn't they, you know, sort of reasonably respond? No, no, no, we don't need a biased response team to foster free speech on campus. You know, sort of people who are offended by something that someone says should shout back at them, right? They don't need, like, the sort of the machinery of the school behind them. I don't think it makes it a First Amendment violation to create this forum, though. Yes, you could go and shout back at someone. And, in fact, the school allows a lot of speech. There's a lot in the record about the types of speech that go on at the school. And there's information in the record about conservative students taking advantage of the JKRT process and making their own reports and seeking services. So I just don't think that just because the school has created this additional forum to provide this educational service to help its students learn and grow, it means that they've committed a First Amendment violation. Can I ask you a question again, sort of back to my remedial questions about Jill? So what's your response to Mr. Norris's argument based on Welschlager and Harrell that, rightly or wrongly, we've sort of turned down the volume on credible threat in First Amendment cases just because it sort of arguably has this special place in the constitutional constellation or whatever? I don't think that's right. I think they have to show a credible threat of prosecution. And without respect to Jill, or do you think, like, Jill, again, sorry, here we go again for the idiot judge, but, like, do you think Jill sort of, like, substitutes for that? No, they have to show that they have an objectively reasonable fear that they will be punished if they speak. That's the key. They come and they say, I'm chilled. Well, you have to look at, okay, do you have a credible, is there a credible threat of prosecution? So Jill cannot arise from anything short of a credible threat of punishment. It can't arise from, I guess, yeah, so it can't arise from anything short of that. That's right, because, I mean, you could have a situation where someone actually gets punished for what they said. That's not what we're dealing with. We're dealing with a situation where they have not said anything. They're just saying, we're too scared that we will be punished in the future if we say something. So there's a threat of future punishment. And so you have to look at whether or not their fear is objectively reasonable. So just being sort of, like, my term, like, run through the ringer, even if no punishment comes out the other side, is not sufficient to chill ever? Certainly not here. I don't know that, I mean, I'm sure you could find a case where being run through the ringer involves a lot, a significant burden on a person, and that there is an implied threat that if they don't participate, they could be punished, but there's no implied threat here. And it's not a very great burden. They can simply delete the message or ignore it if they don't want to. So does it have to be institutional punishment as opposed to the consequence that the professors or the people involved in this won't give them recommendations or they will lose opportunities within the educational sphere because of the perception that they're a biased person and the consequences that would come from that, is that not? That's not what they're claiming to fear. They're claiming to fear punishment under the Student Code of Conduct, and that that's why they're not speaking. I'm sorry, please. Go ahead. I wanted to ask you about the harassment policy itself. Let's move beyond just Knight's response team. I take it there's no dispute on the part of the university that they're standing to challenge that. We have argued in the alternative that they do not have standing to challenge this policy, but I do think, I think that if you... Let's just say I prefer to go to the merits. Just speaking for myself, I would say that argument is a loser. It's fine, Your Honor. I'm happy to move to the merits. I was talking for one person, but I'm hard pressed to see how they wouldn't have pre-enforcement standing to go to the merits and be heard on the merits of your harassment policy. I want to know how broad this harassment policy is. Let me give you a couple of examples that they offered. And I want you to tell me, representing the university, whether if I speak in this way, I run afoul of the harassment policy and subject myself to university discipline. Suppose I were to distribute pamphlets at a time that the university allows me to, or suppose I were to be permitted to speak at a time and a place the university allows me to speak. And I were to say that in my view, abortion is immoral. It's a sin against God. And it will yield eternal damnation. Suppose I were to hold that view. It's a religious view. It's a view that I'm expressing through speech. At a time and a place that the university allows me to speak. Would that run me afoul of the harassment policy? Well, I hesitate to take on a hypothetical without knowing all the facts and circumstances. And I think the university would want to, under their policy, they look at the totality of the circumstances. But given your hypothetical, it does not sound to me like what your speech is would interfere with anyone else's right to get an education on the basis of their membership in a protected class. And that's what the discriminatory harassment policy is focused on. But doesn't the discriminatory harassment policy, in addition to traditional protected classes, include things like political affiliation? I mean, wouldn't a Democrat, maybe a pro-choice Democrat, be completely scandalized by what Judge Marcus just said? Being scandalized is not necessarily having the same as having your ability to get an education and participate in educational programs be interfered with. And I think this court. Your verb in your policy is to not scandalize. It's even lower order than that. It's to harass. Well, I want to know whether a woman on campus might reasonably be harassed by a student who was regularly proselytizing about the sin of abortion. No, I right now they're having outsiders on campus. They come regularly every year and proselytize about the sin of abortion. And that happens freely. And the school allows them to come on. It does not punish anyone who engages in that speech. So I don't think anyone would get punished for that. Suppose. I were to use my opportunity to speak as a student on campus. And I would to say that the immigration laws of the United States are deeply flawed. That unbridled, open immigration is a danger to America on a variety of levels. We ought to throw up a wall, etc., etc., etc. With that speech. Proscribed under the harassment policy. Might not a student on campus who fell into the category of being a dreamer. Take deep offense to that and say that that constituted harassment policy. It was severe. It went to his very right to be where he was to learn on that campus. I don't think so, Your Honor. I think that the harassment that is being punished by this university's code of conduct is targeted at an individual on the basis of their membership in a protected class. Not just immigrants in general or women in general or anything like that. It has to it has to be targeted at a person based on their membership in a class and deprive them of their ability to get an education. And the university will consider all of the facts and circumstances there. And again, I can't prejudge everything, but I think it's very unlikely that that kind of a situation that the university would punish it. I want to have to rely on. Do I have to rely on your goodwill? No, I think that that's how the goodwill. No, I understand. When I looked at the policy, though. The breadth is is quite remarkable. It covers anything and everything I could conceive of from political affiliation to veteran status to to gender, to race, you name it. It's it's all there. It is. But I have to be worried as a student is all I'm trying to say that I couldn't express these views safely without running afoul of some kind of disciplinary action. Well, again, here we're setting aside their standing to challenge it. We're not talking about chill. We're simply saying on the merits, can the university punish a student for engaging in the types of speech that are prescribed here, the types of conduct? And I think the court's decision in Doe versus Valencia College is incredibly instructive here because it looks at what the school is doing through the lens of Tinker. And it and it says Tinker allows a school to punish a student for engaging in conduct, including speech that interferes with the rights of others. So Tinker allows that the United States Supreme Court allows that kind of punishment. So then you look at this policy and says and you look at it and you say, are they punishing students for engaging in conduct, including speech that interferes with the rights of others? And I think they are. That's what exactly what they are doing. So you don't look at it through a content based strict scrutiny analysis. You're in you're in Tinker land. So are you, though? I mean, like so you've got some cases that say, you know, Doe and, you know, that say that we've sort of like taken Tinker and just like plunked it down in the university setting. They've got some cases that say like that can't possibly be true. And in fact, we've got cases that that say, you know, sort of First Amendment interests are at their zenith in the first and in the university setting. But I mean, like given what the court said in the the cursing cheerleader case, case names never mean anything to me. But the cursing cheerleader case, you know what I'm talking about? Where you're off campus and the court says, yeah, the whole in loco parentis thing here like doesn't really hold up. And so, you know, sort of it's Tinker lite or whatever. I mean, how can it possibly be that in the university setting, like as a matter of first principles, that something like Tinker applies? Well, this court has applied Tinker in the university setting. Well, we sort of have and then we haven't and we haven't and we haven't. So I'm just trying to figure out like setting aside like the confused case law. Why, like as a matter of first principles, do you think that Tinker is the right regime to apply in the university setting? Because you're still dealing with a school setting where you're trying to provide education to students. And yes, there are differences in how Tinker should apply in the university setting. And if so, what are they? I think I think it would be come in the application. You'd still you'd still look at did did the students conduct interfere with the rights of others? But then it would be up to the institution. There's a lot of different deference given to the institution and how to deal with that. Well, I guess that this is sort of gets to the root of my question. I actually think that there is a lot of deference under Tinker again, rightly or wrongly, but because you're dealing with like kids, right? Children, you know, but I don't know. Is that is that you think that holds up in the university setting? Yeah, I think so. I think that they can take into account whether these are kids or older people when they're deciding how to respond to an incident. I don't think it means that they can't prohibit it. Yeah. And I know I'm over time, but I was hoping to address Judge Marcus. You brought up the idea of the severe or pervasive and severe and pervasive. Can I ask you a question before we just before we leave this? And because you keep using the term these classifications and so forth, so long as it interferes with the rights of others. And that's a pretty broad concept to me. I think the actual language is more along the lines. It interferes with the education of them. But that goes back to, I guess, the Davis approach to it. But in your policies, it's even broader than that. It interferes with them. One that I found interesting is activities, college activities, that it could interfere with college activities, which seems like a pretty broad thing. And so I was thinking, gosh, this is really broad until Judge Marcus gave you examples, and we haven't hit one yet that violates the policy. And so I'm wondering, how does one define interferes with education, interferes with activities, and so forth? I suppose it's an objective standard. But from the eyes of the person who's been offended, such a person in that class, would they objectively be offended? Or would any person be objectively offended? And I ask those questions because I'm struggling to find out if my language is prohibited or not, which gives me pause. So if you look in the appendix, volume one, page 38, you'll see the definition of hostile environment harassment. And there, it talks about how that's the language that says discriminatory harassment that is so severe and pervasive that it unreasonably interferes with, when viewed from both a subjective and objective perspective. And then it lists a number of factors that the university will consider in evaluating whether hostile environment exists, including the frequency of the conduct, whether there was a physical threat, a whole bullet point list. I think that that content gives shape to what they're talking about. And the university is going to say, look, a student can make a report. We will evaluate it using the totality of circumstances test, whether it's both subjectively and objectively deprived a person on the basis of their status of participating in school, whether it's education or educational activities. So it would have to be bad enough they left? No, not necessarily. But if they feel scared to go to class, if they feel scared to participate in class, if they are, in some way, unable to participate in a program or activity. There's a lot of Title IX cases out there with examples of what's going on. But if you look at the Doe versus Valencia case, that was a stalking case where one student was harassing and stalking another, sending her messages all through the night, claiming he wanted to do all these awful things with her. And she feared for her safety. And this court said, yes, the school can punish him for that. And so to get back to the severe and pervasive issue, nothing that the Supreme Court says in Davis implies that a court has to use or a university has to use a severe and pervasive standard when deciding whether or not to punish a student for engaging in discriminatory harassment. In that case, the Supreme Court was simply considering, can a school be held liable for failing to respond and prevent that kind of behavior? And so they wanted to know, does the school have actual notice of what's going on? And in that circumstance, they said, a plaintiff can only bring a civil case for damages against the school when the school is deliberately indifferent to severe and pervasive conduct. They did not say, and that means the school can only punish severe and pervasive conduct. In fact, in that case, in Davis, it says a single instance sufficiently severe could be punished. There's a line in the case, and I can give you the page if you want it, but there's nothing in Davis that says severe and pervasive must be the standard. Let me ask you just one final hypothetical, because I'm just trying to get my arms around what falls within the policy and what falls outside. One of the examples offered, if my recollection serves me right, by one of the plaintiff parties in this case is, suppose he or she were to say at a time that the university allows her or him to speak, that the Palestinian movement is anti-Semitic. It's riddled with anti-Semitism from beginning to end. Would that speech amount to harassment? Falling within the policy? I don't think so, Your Honor. They would have to target it at an individual or a small group of individuals. That's how this works. And it has to be targeted at that person on the basis of their membership in a protected class. Membership in a class of people designated either by national origin or geography, Palestinian. If he were to say the Palestinian movement is anti-Semitic, or Palestinians are anti-Semitic, seems to me that's focusing on a discrete, identifiable class. And it's labeling a charge, very serious charge. Could I get away with saying that on a campus without being subject to discipline? I think the university would look at all the circumstances there and determine whether or not that had the effect of preventing someone from participating in their education, from getting education. So I think it would be different if that person came to class every day. I don't want a different hypothetical, but I'm asking you to help me with this hypothetical. This student wants to say that. We know that because they put it in the petition here, the claim. To me, that does not sound— Could I get away with saying the Palestinian movement or Palestinians are anti-Semitic? It focuses clearly by a category of people, singles them out, and singles them out in a particularly pejorative way. Is that protected speech on the campus at UCF? Or if the answer is, gee, I don't really know. It depends on the circumstances. Suppose he says that at every opportunity that he gets to speak, when the university permits him to speak or distribute handouts, can he do that without running the risk of being disciplined? Or is that the kind of stuff that the university fairly means to bring within the ambit? Yes, Your Honor. I apologize for talking over you earlier on Zoom. No, no, I'm just trying to get—I'm just looking for help in understanding a policy. And I say, as a preparatory matter, the university has tried real hard. It's gone very far to try and comprehend lots of different things. But I want to know whether I can say what this student purports to say. I think the university would have to look at whether or not what that person is doing is interfering with a person's educational opportunities. That's what—that's the key piece of the policy when it comes to that hypothetical. To me, it doesn't sound like that would be the case, that that would actually interfere with anyone's education. Don't you suppose if I were—don't you suppose that if I were Palestinian and I were a Palestinian American on that campus and somebody accused me of being anti-Semitic, simply on account of being Palestinian, I would take great personal offense and umbrage at that? There'd be nothing modest about my reaction to that, would there? Right. And I think that, yes, you would likely take offense to that. But taking offense is not the same as having your ability to get an education interfered with. So I'm not saying it couldn't possibly be punished, but the university would have to investigate and look at the totality of the circumstances, look at the factors that are laid out in the hostile environment harassment definition, and interview the subject and the person who complained and say, make a decision. You know, did this interfere with this person's ability to get an education or not? I appreciate your answer. I only had just one final question and you may have been going into it. To what extent is it wise for us to use the language drawn from Title VII, as opposed to the language drawn from Title IX, as opposed to something else? I think the court should be using the language drawn from Tinker, which says that schools can punish students for engaging in conduct that interferes with the rights of others. And then it's up to the schools to add content to that. I think that if a school wants to punish discriminatory harassment that is severe or based on severe or pervasive conduct, I don't think Tinker, I think Tinker would allow that. And I think the Supreme Court's decision in Davis would allow that. I think if a school wanted to ratchet it up and say we're only going to punish severe and pervasive, it could do that too. But the First Amendment doesn't require that it has to be a severe or pervasive standard. That's what Speech First is arguing is that the First Amendment says you can only punish severe and pervasive and no further. But that's not right. No Supreme Court case has held that. And in fact, many Title VII cases have said in another context, you can punish severe or pervasive conduct. There's no problem with that. And the First Amendment didn't stop them from doing that. So I don't think that the First Amendment requires and only permits a school to punish severe and pervasive conduct. You can certainly imagine cases where a single incidence of severe conduct can inhibit or interfere with the rights of others. It can, in this circumstance, interfere with their ability to get an education free from discrimination. And so I think a school should be free to punish that behavior or deal with it however it sees fit. And that the First Amendment doesn't stop the school from doing that. Thank you. Thank you very much, Mr. Bilas. Thank you, Your Honor. A for endurance. Mr. Norris, you've got three minutes, which may turn into 30. Thank you, Your Honors. Hopefully three points in three minutes. The first is my friend ran through some examples of what might be covered by the discriminatory harassment policy. But we have a real world recent example with Professor Nagy where the policy was applied to him. One of the violations, he was charged with repeatedly violating the policy. And I'm not here to defend most of what he's accused of. But it's interesting how they applied it to him. He was charged with a count of gender identity discriminatory harassment based on the fact that he made, quote, sporadic comments criticizing the notion that people can be transgender. Sporadic comments. And I think the university says about one comment a year was what he was found to have violated the policy for. And our students want to say similar things, which is why the policy, we think, plainly applies to that speech. My friend said the speech would have to be targeted at a particular person. The word targeted does not appear anywhere in the discriminatory harassment policy. The closest they get is there is a laundry list of non-exhaustive balancing factors, one of which is was the speech directed at someone. So they may ask whether it was directed at someone, but there's nothing that requires that to be a violation. And, in fact, if you look at tab 3-1 at page 68, the university says you should read our disciplinary rules, including the discriminatory harassment policy, broadly. And you should read their terms to be non-exhaustive, which means I don't know how my friend can guarantee that any of those situations are not covered by the policy. And as this court explained in the ACLU v. Florida Bar case, it's not enough for a university to come up after it's already been sued and promise at the podium that all of these examples are not covered by the policy. That sort of back-end First Amendment exception after someone's been charged and investigated for discriminatory harassment doesn't remove the chilling effect. Can I ask you a quick question about – I hate to interrupt your flow, but I think the tougher road to hoe for you here is the JKRT. That's my sense. And I'm just wondering – so did you say earlier that the JKRT exists to facilitate enforcement – I'm trying to use my language carefully here – of the harassment policy, the anti-harassment policy? Is there something else that the JKRT enforces? It enforces the policy on bias-related incidents, which has a whole separate definition. So I see. So if we were to conclude that the anti-harassment policy, that they're standing and then it violates the First Amendment for some reason, it's not as if the JKRT objection just sort of melts away. It sort of remains because it's its own problem in your analysis? Correct. Though if you think the discriminatory harassment policy is at all close under the First Amendment, look at the bias-related incidents policy. I mean it is clearly unlawful if the JKRT chills speech as we say it does. And if I could just make one more point about the JKRT. We agree. We're not here to say it's an easy call. These teams are designed to be right up on the constitutional line. Universities have lost a series of cases involving actual speech codes like the discriminatory harassment policy. So these teams arose nationwide. The university is not unique in this regard. There are lots of these teams across the country. And they arose in the hopes of getting at some, in our view, in the hopes of getting at some of the same speech that those harassment policies that were struck down were trying to get at. But we think it goes over the line when you have administrators, disciplinarians, you ask for meetings, you threaten referrals, all those things in totality actually chill speech. And just one more clarification. We do not have to prove, although we think it does threaten discipline, that is the idea that's supposed to go in students' minds. We don't have to prove that there, to prove adequate chill, we don't have to prove that there's a threat of discipline. Judge Marcus, you wrote for the en banc court in the Walschlager case that reputational harms and administrative harms can equally chill speech and implicate the First Amendment. Those are present here. Judge Brennan, his concurrence in the Seventh Circuit case that we brought is really good on this point. Process is punishment in some instances, and it isn't this one. And that's why it implicates the First Amendment. If I can have the opportunity to put on my district judge robe for just a moment. And this, I promise, is going to end with a question. But I appreciate one of the concerns you raised, and it's raised in a number of the amicus briefs as well, is the concern that people be able to express themselves openly and freely. And a concern with these teams is that you're dealing with administration. They're going to get reports about what you're saying and so forth. There's a disconnect there for me, because if you're saying we want to be able to say this out loud on the street corner, those folks are going to know you're saying it. So I don't know that that's a big issue to me. But by the same token, I do appreciate and understand the arguments you're making. But I think there's a balance that has to be struck here somewhere. I think a university has a legitimate interest in trying to promote speech. And that's what they're arguing these are intended to do. You argue that's a fine thing to intend, but you're doing it all the wrong ways. And that's what I asked. My first question to you was trying to identify the positives and the negatives. My question to you is this, and Judge Presnell can thank me later if this ends up back in his lap, but I'm not going to say what I would do. He'll do the right thing. But if this got sent back, if you were found to have standing on the JKRT issue, would you be willing to sit down with lawyers from the university and talk about what an appropriate team would look like in these circumstances, not call it a team, call it whatever entity you want to, but there was some place where people could go to try to voice their views without standing on the street corner and screaming at each other, without engaging in acts of civil disobedience or whatever, but really gave students an opportunity. If we talk about the universities and colleges being this place where people are allowed to expand and grow, to give them that opportunity through a meaningful dialogue as opposed to shouting at one another, which I realize is the preferred means of communications today. But if we offered that opportunity, would you be willing to sit down with the other side and bring all your expertise on this to the table and actually develop something that had the students' interest in mind and actually promoted communication among students? What a great thing that would be. Is that something you would even . . . I'm not going to ask you to commit today. I'll just ask you to think about it, that that's something . . . that's not adversarial, that's not advocating. It's working and trying to find solutions. Let me give you two reactions to that, which is what happened in the Fifth and the Sixth Circuit after we won those cases. We talked to UT immediately thereafter. There was no more litigation in the district court. UT agreed to disband its campus climate response team. I've heard no reports that bias is rampant on their campus. Michigan agreed to replace its bias response team with something far less sinister, and I believe that's still operating on campus today. So we're happy and expect those conversations to occur. Thank you. Mr. Norris, one quick question that Judge Newsom was asking you further about the standing question on JKRT, which we talked about. You make two arguments. One goes to why you think there is standing, and it's the second point you make that I want to ask you very briefly about. You say, assuming arguendo that there is standing, the district court got that wrong, we should actually go to the merits of the policy itself rather than remanding that back to the district court. That's one thing you suggested. Why wouldn't we more appropriately send that back to the district court to address in the first instance rather than us taking a stab at the merits? So if you agree with our framing, Judge Marcus, the question on the merits is whether the bias-related incidents policy is overbroad, vague, viewpoint discriminatory. That argument is conceded in this case. The university has never defended the policy if it was put to the choice of defending it. It is only argued that we don't have standing because the policy does not do anything, and that's the same argument it makes on the merits. So you're going to have to deal with that argument because that's obviously the point in dispute. But once you get past that, there's no there there. They have no defense. I may have missed it. It may be my mistake. But I wasn't sure that I understood them to concede that you were on the merits. I'll say they have forfeited the argument that the bias-related incidents policy could survive First Amendment scrutiny. Because they didn't argue it here, you mean. Correct. But I would say it's actually not forfeitures. It's even a waiver because their brief asks you to go ahead and read. If you find that we have standing, asks you to go ahead and reach the merits of the JKRT as well, we think you should. It's a pure question of law that there would be no abusive discretion veneer over what the district court does. It's before you. And we've actually asked you, because our students are going to graduate on May 5th of this year, we've asked you to go ahead and enter a preliminary injunction because under this circuit's case law, after you conclude that we're likely to succeed on the merits, there is no further inquiry. All the other preliminary injunction factors are satisfied. Thank you. Okay. Very well. Thank you both. Good arguments on both sides. Well lawyered on both sides. That case is submitted, and we will be in recess until tomorrow morning at 9 a.m.